After a jury trial, Mr. Wright was convicted of one count of distribution of child pornography and one count of possession of child pornography. Mr. Wright raises two challenges to his convictions and one challenge to his sentence. I hope to get to all of these today and I'd like to begin with Mr. Wright's Doyle Challenge. Very briefly, what happened was on the morning Mr. Wright's house was searched pursuant to a warrant, Mr. Wright was taken into a police vehicle, given Miranda warnings, and questioned. He answered a number of questions, but he declined to answer others. In the first part of its closing argument, the government brought up Mr. Wright's refusal to answer one of the questions and defense counsel objected that it was a forbidden comment on post-Miranda silence, but the district court overruled the objection. The government went on to specifically and directly link that refusal to answer the question to Mr. Wright's guilt. Under Doyle v. Ohio and its progeny, due process forbids the impeachment or substantive use of post-Miranda silence as part of the government's case. Here the government not only mentioned, but exploited Mr. Wright's refusal to answer post-Miranda by suggesting that this silence was indicative of guilty knowledge and intent. I noticed pre-trial there was discussion about whether or not the hour-long car interview would come in. In the end, there was a redacted audio that came in. Did the redactions in the audio contain the question and answer about the attorney? Yes. And there was no objection then? There was no objection to that coming in, no. So the jury heard him say, I probably want an attorney? Yes, it did. But what we're complaining about is not the jury hearing the refusal to answer. What we're complaining about is the government's use of that silence to ask the jury to infer guilt from that silence. You're saying it doesn't depend on custody, that's irrelevant, even though you're arguing he was in custody. You're saying it's triggered totally by the Miranda warning? That's correct. We think that's a fair reading of the Supreme Court's decision in Wainwright v. Greenfield and other cases. We submit that the government can't, with respect to that Doyle error, meet its heavy burden of proving that the error was harmless beyond a reasonable doubt for a couple of reasons. Well, before you get to harmlessness, because you're right, in Doyle, harmlessness is a high, high level. I don't remember, is the government arguing harmlessness here? Yes, it is. Did the attorney for your client move for a mistrial? Yes, she did. Moved mistrial? Yes. Or did she object? No, she objected and moved for a mistrial, and the district court overruled . . . Would you, sorry, I'm interrupting just because I know your time is precious, do you want to get on? Would you agree that, though, Doyle is only triggered by the same level of unambiguous implication as Davis? Do you agree with that or not? In other words, you don't have a Doyle issue if he isn't asking for an attorney? No, I don't agree with that, because I think there are two components that are relevant, and one is the right to remain silent, and the other is the right to have an attorney present, and I think it was very clear that he was invoking his right to remain silent. I know, but, okay, so therefore, he invoked his right to remain silent, and they violated it throughout, and that blurs in with your Miranda Fifth Amendment argument, right? You're saying the entire thing, or are you saying there's such a thing as selective invocation, which is . . . Yes, we are saying there is selective invocation of silence. So you're saying he selectively said, I want to talk to an attorney when you start asking me about how young the girls are in the pictures. That's the area that he invoked his . . . Well, I think we're getting a little into the Edwards issue. I think what we're talking about here is irrespective of whether he asked sufficiently for an attorney. What we're saying here is, at a minimum, he invoked his right not to answer questions, to remain silent, which was his right . . . Not under any Burgess or Davis. It's got to be unambiguous. You agree with that, yes? Yes. Under the Burgheist decision, I think that they said that it has to be the same level for both the right to silence and the right . . . But then it all . . . I mean, the Doyle argument, which is a very difficult one, I think, and I look forward to hearing from the government on it, but to me, it may all turn on the word probably. Is that sufficiently unambiguous to trigger both Fifth Amendment and Fourteenth Amendment rights? Well, I don't think the Fourteenth Amendment should play here, since . . . Well, Doyle is Fourteenth Amendment. Right. But it is the Fifth Amendment due process right in the context of a federal prosecution. The only reason you get to Doyle is because you say it's unfair for the government to say, on the one hand, okay, don't answer those questions, because we don't want to infringe your right to an attorney. And then it turns out the government, in closing, turns around and says, well, ladies and gentlemen, he didn't answer those questions, because he must be guilty. Right? That's the Doyle problem. Correct. I think we're saying the same thing. I'm saying it's the Fifth Amendment due process right, as opposed to the Fifth Amendment privilege against self-incrimination. You're right. You're 100 percent right. I'm wrong. But I think it is very clear that he was . . . if you look at the context, and especially if you look at things that came after, it's clear he was exercising his right not to answer certain questions. Whether he also exercised his right to have an attorney is a different question that is pertinent to the Edwards violation. But as far as the Doyle question, we submit he selectively invoked his right to silence and the government infringed upon it, and . . . Tell me, I didn't think you could selectively invoke your right to silence. Well, I think you can selectively invoke it if . . . They let him selectively invoke it, but . . . Well, no, I think you can invoke your Miranda right to silence at any point during the questioning and, in fact, that appears in Miranda itself, and . . . Yeah, but then they're not supposed to . . . you know, ideally, they don't question you any further, right? Well, ideally, that would be true, but in this case, the question did proceed, but what we have for purposes . . . There's a circuit split on that issue, and it's beyond the briefs, but the Eighth Circuit says it's a unitary conversation. Seventh Circuit says so, too. Other circuits disagree. I don't think our Court's yet spoken on that issue. Well, no, but I think the Court has spoken, at least inferentially on it, in the Rodriguez case, because what happened in Rodriguez was Mr. Rodriguez answered some questions and made some statements, and then he invoked his Miranda right to silence, and this Court found that there was a Doyle violation when the government commented on what he had not told the officers in the post-Miranda silence. Is that in your brief, Rodriguez? Rodriguez is cited in the brief, but certainly, many other circuits have held that you can do that, and I think that that is consistent with Miranda itself. Do you have a case that says that there is an invocation . . . we can infer that there was a sufficient invocation by the behavior of the police officers to then stop asking in that area. In other words, let's say I read the word . . . I probably don't want to go there, but I don't see that as sufficiently clear to get to the stringent level, yet the record shows the police did see it that way. Do you see my question? Yes, and I think we cited for that proposition in the opening brief the Second Circuit's decision in Wood v. Ercole, which states that . . . and I believe there are other cases, which I can 28-J to the Court, but there are cases that say how the police react is a very important marker in determining what a reasonable person would have understood by those words. But I just wanted to point out, before I move on from the Doyle error, this Court has held in cases like Rodriguez and going back to the Chapman case, that where the government explicitly links the act of remaining silent with the defendant's guilt, that's reversible error. And I note also that the government brought up this refused to answer question in the opening part of its closing argument, even before the defense had said anything, which I think is very indicative of how important the government saw that. I don't . . . I personally wonder why this wasn't harmless beyond a reasonable doubt, because they have his computer, they have him admitting it's his computer, it's his password that's protected, there's no question that this . . . about child pornography. So why is that not harmless beyond a reasonable doubt? Well, I think there were some questions that came out of the trial. First, there was evidence that these computers were not password protected and that many, many people had access to them. As far as the distribution, I think the evidence was rather ambiguous about whether Mr. Wright knew that he was sharing these files when he downloaded them via FrostWire. And that was the premise upon which the case was tried. But he was . . . fixed computers for a living. He did fix computers, but he was not familiar with programming, is what the record reflects. But he knew what FrostWire was. Yes, obviously he knew what it was and he used it. But there were still questions about the extent of his knowledge of the sharing function of FrostWire. What about the Prado case? And then I promise I'll let you get to your other arguments. Which case? Prado, P-R-A-D-O. They . . . didn't they urge Prado . . . I may be mispronouncing it . . . that it was a case, you'll remember by the facts, where the government was allowed to, in closing, impeach based on omissions. If you waive . . . if the defendant waives . . . Oh, Pando Franco. Pando. Okay. Okay. Yes. And we do cover this in the reply brief, but essentially what we're saying is that there's a difference in impeaching by omission. When a person speaks, the Supreme Court said in Anderson v. Charles that it's fair game to . . . That's only triggered by the defendant taking the stand? No, no, no. It's fair game. I suppose you could do it even if they didn't take the stand, but you can comment on what they didn't say, where they spoke, and they never invoked their rights. But conversely, the authority that we've cited says that when you invoke your right to remain silent, it is forbidden to comment on that silence, and that's the difference with Pando Franco. I have very little time for the Edwards motion. I think there's two main questions, which are the custody question and the invocation of the attorney. Given the very short length of time I have left, I'll be glad to answer any questions about those, but I think we have covered them pretty thoroughly in the briefs. Plow into what you want to plow in. You've still got some time. Use what you've got. Right. Well, I have a sentencing issue, too, so . . . But anyway . . . Take a minute and do the . . . Okay. Well, basically, we submit that the custody determination, which is on de novo reviewed by this court, that the court should find under the totality of the circumstances that Mr. Wright was in custody, and we . . . What's your best analogous case? During the interview, he's not cuffed. He's allowed to go at the end. They don't have their guns drawn during the interview. The best analogous case from this circuit is Cavazos. That case had cuffed throughout, right? I don't believe so. I believe he was not cuffed when he was questioned in his bedroom or in a back bedroom in his house. And also, the police didn't really say free to leave. They said you're noncustodial or something. It was much less clear. This guy was told, you can leave any time you want to leave. Right. But from other circuits, the Colonna case, which I think is from the Fourth Circuit, and Lee from the Ninth Circuit, both of those involved questioning by the law enforcement and a law enforcement vehicle adjacent to the defendant's house. So those are very similar on the facts. Just basically, you have all the circumstances. You had 17 to 19 law enforcement officers. You had Mr. Wright was monitored and accompanied. He was taken back into the house and forced to get dressed in front of law enforcement officers. Officer Barnes said he probably looked through Mr. Wright's wallet and kept his driver's license. Mr. Wright was given Miranda warnings. He was questioned over an hour. That's a factor the court has found significant. And I think perhaps most significant, if you look at the nature of the questioning, it was very accusatory. Mr. Wright was almost from the get-go confronted with evidence that the officers had of his guilt and he was urged to come claim. He's also pretty volunteering. It's conversational. He says, oh, and by the way, I use this FBI wash device. He's extremely unguarded. Well, if you listen to the tape, my take on it is that he's very nervous and he's talking nervously. But on the question of invocation of the right to counsel, I gave you an additional two minutes. Thank you, Chief Judge Stewart. At page 11 of the transcript of the questioning, he says, I probably should talk to that lawyer first. Yeah. We think it's significant. First off, he said, that lawyer. The phrase, that lawyer, is clearly referencing back to Officer Barnes' giving of the Miranda rights. And second, it's also significant that he ended the sentence with a confirmatory word, yeah. That is a very definite word, yeah. And as Judge Higginson pointed out, Officer Barnes' reaction is significant as well because Officer Barnes clearly registered the mention of counsel, but he drew the wrong lesson from it. He thought he could continue as long as he continued on another subject. But that's contrary to the law of Edwards, which is that the police can't just keep going and trying to cajole the defendant out of his invocation. And the district court— There's a case that says that when you modify it by probably, that gets you past Davis. I couldn't find a case that said that's unequivocal or unambiguous. I could not find any cases involving the word probably, but I think in context, looking at the totality with the word, yeah, the reference to that lawyer and the fact that Officer Barnes himself took note of that mention, I think all of these things show that it was a sufficient invocation. And I do want to talk just very briefly about the sentencing issue. Did this fellow have been arrested before or investigated previously, had he not? There were allegations from 1997 that were— About his arresting a little girl. Right. But then there was never any prosecution, and they never came to anything. And in fact, the PSR found that the information about it was too unreliable to be used at sentencing. Well, I just wondered whether, you know, he had encountered the police in an adversarial context previously. Well, he mentioned that he had been arrested for a misdemeanor before, but he mentioned also that at that time, he had not been given his Miranda warnings, and he found that unusual. Just—well, I see my time is up. Go ahead. Just— We've asked you a lot of questions, but it's an important case, you've got to admit it. Thank you. Our sentencing issue deals with Rule 32I-4A1, which says that before imposing sentence, the court must provide the defendant's attorney with an opportunity to speak on the defendant's behalf. And as the Second Circuit said in Gutierrez, this has to be a meaningful opportunity because this is the mechanism by which the court is prevented from relying on inaccurate or unreliable information and making sure that the court's use of the sentencing information comports with settled law. And what happened here was that defense counsel spoke, the government counsel spoke, defense counsel asked if she could respond to what the government counsel had said, and the district court said no. We're asking for a very narrow rule here, and it's this. Where government counsel brings up matters which defense counsel has not addressed in her allocution, and where defense counsel specifically requests the right to respond to those matters, but the district court denies that request without reasons, then reversible error occurs under Rule 32I-4A1, that's the left subsection. All right. Well, we've got you the main thrust of that, so you at least got it in on opening. And I appreciate the extra time. Thank you. You've got some rebuttal time to cover whatever else you may need to coming up. All right. Ms. Wilson for the government. May it please the court. The district court correctly overruled Wright's objection during closing argument. No Doyle error occurred here. It's a very narrow test. Wright wasn't under arrest and is set forth in the brief, and Burke, this court stated that no Doyle error occurred where closing arguments were referenced before, defendant's silence before the defendant's arrest. But more importantly here, Wright's silence wasn't used for impeachment purposes. But, I'm sorry, no Doyle error because he wasn't, he was never arrested? No, he wasn't in custody. Right. But, but that, but regardless of whether Miranda warnings are given? Well, what I'm also saying, though, is however— Are you saying that at all? Well, Doyle's, I mean, excuse me, Burke said that where they weren't in custody, and of course we're doing this, my argument, my custody argument, I'll discuss a little bit later. But I understand where the, where the Miranda rights were given, he, the, the, the law enforcement, if you will, Officer Barnes was sensitive to it. But this case is a little bit different, this appeal. Is the government arguing at all that you can't have Doyle if you aren't in custody, even if you were given Miranda warnings telling you that you could stay silent or get an attorney? Is that— Well, once the Miranda warnings were given, of course he had the right to remain silent if he so chose. But he did not hear, as the district court found, and as I will discuss in conjunction with the custody argument. But what's a little bit different here is during closing argument, the prosecutor was as the, as I set forth in my brief, as the transcript reads, before we get, we allow her to finish the, the closing, that particular portion of the closing argument, the district court says that she wasn't commenting on Wright's silence. And in fact, what she was actually referencing is she was using his words to infer guilt. Because when she's able to finish that particular section of the closing argument, what she's talking about is he said he didn't want to get in trouble. Typically, what, as this court knows, what you see in a Doyle situation is where a defendant's actual silence is used to impeach. And here— Am I right? I mean, at closing, she says, quote, he won't tell Officer Barnes what ages he searches for. Except there's an objection right then and there. The district court starts to say what I just said. The prosecutor says he, you know, he, I got cut off, or he won't let me finish, or something like that. There's a little bit more of exchange between defense counsel, the district court judge, again, the prosecutor, I believe, says again something about being interrupted. Once the district court overrules the objection, she then says, because he didn't want to get in trouble. Because if you look at that particular portion of the transcript, that's what he says. He didn't want to get in trouble. And so those were the words that she was using. And it's sort of a—I don't know if Hobson's choice is the right word. What Doyle case would you have that if the government first makes an explicit reference to your exculpatory story, but then is allowed to continue and say, well, I didn't mean to comment. I didn't mean for you, jury, to infer from him not explaining it. Do you have any case that says the government can cure itself when the district— Well, I don't think that is the situation. I think what we have is a prosecutor who's interrupted in mid-thought with an objection. They approach the bench. The district court makes the ruling, and the prosecutor's allowed to finish. It's very clear in the record. The prosecutor is saying that she wasn't allowed to finish, that she was interrupted, which I think is different from the situation that you just posed. Okay. Do you have any case that sort of says that, that there's no Doyle violation because the defense attorney's interruption, anticipating one, was too interruptive and confused the situation? No. I don't recall anything like that off the top of my head, but I think that— Usually what happens is you get an immediate curative instruction. Ladies and gentlemen, don't even begin to think about—you heard earlier, you had the tape. The police themselves, everybody knew he didn't want to talk about the age of the photos, and he was told by the officers, fine, you can have an attorney for that set of questions. We respect those parameters. We won't go there. But then in closing argument, the prosecutor says, he didn't go there. Boy, you can infer that he must have known because he was scared to go there. Well— That's classic Doyle. No. What she said, with all due respect, is she's not asking them to infer that's not why he wanted to go there. She's using his words. He says, I don't want to get in trouble, or something to that effect. Those are his affirmative words that she's referring to. And so I think this particular issue has to be read in context. She says something about something that the jury has already heard. The jury has heard this transcript, which also is a component, if you will, of harmless error analysis, assuming this court even finds a Doyle issue. So the jury has already heard this, and she's arguing the evidence. And the evidence was, I don't want to get in trouble. That manifest intent—her manifest intent is not what I would call a classic Doyle situation. I mean, frequently what you see in the cases are where maybe it comes up on cross-examination where the silence is used. I think even Judge Stewart mentioned that in the Marino case about where you typically see this. However, I do realize that Doyle isn't limited just to direct and cross-examination. But contextually here, what she was talking about were his words. But even if this court were to find a Doyle error, it's an isolated occurrence. And the harmless error analysis would apply. What's the best—you've read Ann DeVerte, correct? Of course I've read Ann DeVerte. All right. There we found error and clear, but found only on plain error prongs. I understand. What's your best harmlessness case in the Doyle context? Well, I think the Pando-Franco case, which was set forth in my brief, is—which I discussed in my brief, they discussed in their reply brief—is very helpful. But so is Doyle. I thought Pando didn't even find error. I thought Pando was a case where the government's allowed to comment on omissions. Was Pando a harmlessness finding? I'm sorry? Is Pando a harmlessness ruling? Pando finds there's no error because the defendant can't have it both ways. Okay, but so how—why is that your best harmlessness case? I didn't hear if that's what you said. What's your best harmlessness case? Well, I don't—my best harmlessness case—harmless case, I think, would be the cases cited in my brief, but it all flows from Doyle. And the Doyle inquiry is very narrow. And here, as I said, the harmless error is we have a very isolated occurrence, and we have a jury that's already heard the entire tape. So this is not even a particular part of testimony that we're hearing. And by the end—I know there were certain parts that were redacted, as the Court recognized. When I read the record pre-trial, the district court stumbles over exactly this problem. In the pre-trial conference about what's going to come in or not, the defense said, well, wait a minute, you've already denied my motion to suppress. What about the portions of the tape? And he says, oh, those won't come in. We're going to have to redact those. And then he says, well, wait a minute, that would be inconsistent with my ruling. And I couldn't find what later happened. So you're telling me the redacted tape did or didn't have the portions relating to the Doyle situation? I agree with opposing counsel, with Mr. Crooks, that they came in. And they weren't objected to? It looks— Well, the objection is along the lines of it's the same objection as I raised in the motion hearing or something like that, and everybody finds that—then they go with it that way. In your brief, did you argue that the admission of the tape in the case-in-chief in any way affects the Doyle issue? Did you argue that in your brief, either in harmlessness or in substantive? Well, if you're asked, I did talk about how the jury had already heard this, had heard the tape, and then we have the other evidence. But this is an isolated occurrence. This is not—in your Anna Verde case, as I recall, there were five situations or five Doyle complaints. And it was in conjunction—I know there were some—I can't remember if it was—I guess it would have been a closing argument, but there was also testimony. Here we have a very narrow situation, and again, we have something that the jury had already heard. And as I said before, the prosecutor, when allowed to complete her thought, talks about how his words were used, meaning, I don't want to get in trouble. And that is their entire Doyle argument, is he didn't want to talk about agents, I don't want to get in trouble. That is an issue you heard me ask. I don't know how Doyle law deals with that. If case-in-chief substantive evidence comes in with the entire sequence, does that minimize whether or not—in some ways, that's worse. The government's used it in its case-in-chief, the his invocation of his right to silence. But in some ways, you may be right, that that would go into harmlessness. I just don't know what the case law is. I don't think you briefed it. I'm not, with all due respect, I'm not sure exactly what you're asking me. If, in fact, what we have here is the jury listened to the tape, the judge was very clear that he wanted it uninterrupted, no questions during it. So— The jury hears the defendant say, I want to talk to my attorney about those questions. And then he hears, the jury hears that— Well, I would disagree that those were the words, how he mentioned a lawyer. Those were not his exact words, but— Well, the police, the district court in its ruling said the police then shifted focus. You in your brief on page 14 said the police respected the parameters of him not wanting— Right, I agree with that. So are you disagreeing that he made a selective incorporation, a selective invocation of his right to counsel? I think that three times during that approximately one hour interview, a lawyer was referenced. Was it selectively incorporated? I thought your brief said that on page 14. And I thought that you— Selectively incorporated? That he said, as to those questions, I don't want to talk. I thought that was acknowledged in your— I think your words are stronger than the words he uses. He says he probably should talk to a lawyer. I think that's what I say we're getting into. Then again, we're getting towards the lawyer. And some of the cases, for example, on page 45, I believe it is of my brief, including the Wood case, talk about where words are equivocal, because the Davis case is very clear that the invocation has to be unambiguous and unequivocal. How did the police interpret it here? The police give him a wide berth on that particular issue, then they come back to it. But that's not what the Davis test is. The Davis test looks at the actual invocation. I asked him this. What case do you have that the Davis unambiguous test applies in the Doyle context? In the Doyle context? I think the Doyle context is very narrow, and we're shifting focus here because now we're— Do you have a case that's— Well, I think, with all due respect, I think that the Doyle cases and their progeny are clear about either it has to be the manifest intent for impeachment or essentially to nudge the jury. Those are my words. But I steadfastly maintain here that the prosecutor was interrupted, and I understand why a defense lawyer would do that. We're told from day one in law school we're supposed to object as soon as we hear something. But the prosecutor is equally clear here that she has been interrupted and not been allowed to finish. So it's unfair to say that she was using his silence when, in fact, she's saying, you didn't let me complete my thought. And the situation is even more egregious here where it's a very isolated occurrence. It's not like the Anna Verde case or some of these others where you have this constant invocation or you're taking it to an extreme. It's very isolated here. Well, that really—that goes back to my harmless error business. That's exactly right, Your Honor. That's exactly right. And we have the evidence. We have his family talking about how he had all of this knowledge of computers, identifying the computers, the family disavowed any personal connection to the compu—you know, knowledge of the computers. We have the computer and the hard drive with his name and with his nickname. And Agent Mott's testimony, which is pretty extensive, goes through explaining all the frost wire and how you find these types of images. So I'm just going to ask you, what is your best—Doyle and harmlessness is a really tricky area of law. What is your best harmlessness case for Doyle? That's all I want to know. I can't tell you that off the top of my head without my brief because I believe that Doyle is—is clear that you do—you can look at it contextually. And here we have the—quite a bit of evidence tying him regardless. And as I said before, the jury heard this transcript. They heard these words come out of Mr. Wright's mouth himself that, I don't want to get in trouble. And, of course, they heard a lot more. But— You're arguing that the prosecutor's argument was pitched to words he uttered as opposed to silence. Right. Yes. Exactly. And that— That's the argument you're making. Yes. That the words were used. That she wanted to use—remind the jury about the words he used, I don't want to get in trouble. That the jury had heard from the— Right. They had already heard that. As opposed to her making the argument in the sense of the jury drawing an inference about his silence.  It wasn't— I'm just trying to understand— That's exactly right. It wasn't used to impeach his—impeach him. The silence wasn't used, if you will, as an affirmative tool. I'm just trying to understand between all the questions and the cases what the government's argument is, not having settled in on it, but just to make sure I understand what you're arguing. Right. And I think that's what I thought you were saying, whether that's right or not is a whole other question. But you're arguing from it. I mean, we're all looking at the words here about the ages, but you're saying it's not a dog problem because she's commenting on what the jury had heard in the tape, vis-a-vis all that. Yes. And I have to disagree with Judge Higginson that she wasn't using it as a curative situation because the transcript is very clear that she is complaining that she's been interrupted. And if you look at the sequence, the judge has heard enough and doesn't want to hear any more from—like the prosecutor defending her position or doesn't want the defense counsel to take it any further. But even if— One little follow-up on it because I don't want to go deeper into it than we are. I mean, but the counsel says, Your Honor, that's a comment on my client exercising the right to silence. I have to give him a random out-of-check, and then she asks for the mistrial. The judge says it's overruled. She's referring to a specific set of circumstances. She's saying that at the time that he was discussing this, he would not make a statement about the age. Okay, so then why isn't that inferring to silence? The judge's interpretation referring to silence as opposed to what—and always what I'm saying is, I heard you already, but I got you. What I'm saying is the judge deals with the objection. Now, in the motion for mistrial, he interprets—he, Judge Hoyt, interprets what he understands the issue to be right in front of him and says she's referring to a specific set of circumstances. She's saying that at the time that he was discussing this, he would not make a statement about the age. Then he says that's not a comment upon his refusal to testify of faith. All I'm asking my follow-up, just from the words so we're clear here on the record, I understood your answer to me about she was talking about words. Given what the judge's interpretation is, how does what he say, what Judge Hoyt said, amplify or tie into the argument you're making to us, other than confusion? Well, and if you go a little bit further, not much further actually, she then talks about being interrupted, the prosecutor. When did the jury get the explanation of what PTHC means? Oh, my goodness. It means preteen— It was— I didn't—I had never heard of it. Preteen hardcore. Preteen hardcore. The jury could draw their own reasonable inferences about what he was going after because he used that term more than once during the interview, didn't he? That's correct. And even in the stuff that came off of his computer was, let's just say, graphically labeled. There's not a whole lot of ambiguity about the type of information or the type of videos and pictures that were being retrieved. I didn't think, given that there was not a sufficiency argument raised here, I did not see the point in going into that in the brief, but it certainly set forth in great detail in the trial testimony as well as the PSR, which—but what I'd like to say just quickly, because I'm almost out of time, is that the government maintains— I gave Mr. Crooks two minutes. We'll give you the same fairness, two more, so you can—we asked you both a lot of questions, so you've got—you know, I want you to not get to the other argument because he's got rebuttal. Well, thank you. But the denial of the motion to suppress should be upheld. What essentially Mr. Wright is asking in his brief is that the government—excuse me, that this court reweigh the evidence, but of course it can't do so. It has to look at this evidence in the light that's most favorable to the government, which is the prevailing party. And as I pointed out in the brief, his Cavazos case was just that, except that one of the big differences, of course, in Cavazos was that the defendant had prevailed, and therefore the court was looking at the totality of— Was the defendant cuffed in Cavazos? I thought he was. Pardon me? Was the defendant cuffed, handcuffed in Cavazos? My defendant or Cavazos? No, no, no, in Cavazos. Cavazos, I do not recall whether he was cuffed or not. Is that the one where they didn't—they used the word noncustodial, it wasn't as clear? In other words— Yes, I know, I know the case you're talking about, and I'm trying to remember if, in fact, it was Cavazos. But Cavazos, of course, they did find. Here, Wright was initially probably cuffed when they were doing the going in and making, you know, securing the premises, what have you, and there was some conflicting testimony on that. But I think it's fair to say that even Wright does not dispute that after a certain amount of time, he was uncuffed, and when he was escorted to his room to change from his pajamas or whatever he was wearing, and then in the car where he closed the door. This is a big context. You're right, 17 to 19 officers? Yes. Did they have guns drawn? Yes, when they went in to secure the premises. Why do the police—I mean, I'm assuming this was the—no, this were the federal police, right? It was a combination. Yeah, why do you do that in a child porn case? Well, Your Honor, it could be that there's production going on. You don't know if there are children being held or anything like that. That is not in the record, but that's what I surmise happens in these types of cases. You don't know if there's sexual trafficking or— In this case, the 404B sort of got closer to that, right? There were children in there, but unclear— Well, they were related children. I'll just interject a little point of personal privilege here. Houston is supposed to be one of the largest sex trafficking destinations in the United States, and we see the U.S. Attorney prosecuting child porn cases, which are certainly horrible. We never see the sex trafficking, so it seems, you know, given what they had here, which was your routine child porn evidence, it just seems like a real overbearing approach to the apprehension of Mr. Wright. Well, and speaking—I haven't been with the U.S. Attorney's Office that long, but speaking from my few years there, one thing that is different in Houston is the appellate cases often don't go to trial because there's a paper trail, if you will. So that may be part of it, Your Honor. I don't know. I'm speaking personally. Thank you. One last question, please. Yes, sir. I've asked a lot. Yes, sir. Can I ask one more? Yes, sir. I'm sorry to you all. I'm good. Don't answer quickly if you aren't sure about this, but it seems unclear in the law where our court is on the concept of selective incorporation. Have you studied it, and do you have an opinion? I know exactly the case that you're talking about where the court acknowledges the circuits that go one way and the circuits that go another way. I don't have a personal opinion on it because I don't believe that the court needs to reach that here based on these facts. I think our facts in this case are very clear. We have a willing—I mean, a defendant who set parameters for a short time, but as I set forth in my brief—I know that I'm really out of time now—he voluntarily spoke with the officers, and so I'll just rest on my brief for all those details.  Thank you, Ms. Wilson. Appreciate it. Mr. Crook, do you have a rebuttal? I'd like to address Ms. Wilson's point about the chronology of the objection and the court's response—the district court's response to that objection because I think it's important, and I think that the government's argument here is based on a mistaken factual premise. If we look at page 1129 of the record, the prosecutor says, It's interesting, though. He won't tell Officer Barnes what ages he searches for. There's an objection. They approach the bench, and the district court overruled it, and as Chief Judge Stewart commented, the district court, Judge Hoyt, said he would not make a statement about the age. Defense counsel clarifies, It's not a comment on refusal to testify. It's a comment on his refusal to answer questions after he was given Miranda and told he could remain silent. The district court says, Well, and he did, which is further evidence that Judge Hoyt saw this as an invocation of silence, and I think that's further contextual evidence going to your point, Judge Higginson, that this was clearly an invocation of the right to remain silent. And so the prosecutor does say, No, defense counsel interrupted me, and she starts to explain that, and the court says, I don't need to hear anymore. I've ruled. And so they leave the bench, and the prosecutor goes back and says, In fact, he won't tell Officer Barnes what ages he uses in search because, he says, Because I don't want to get in trouble. The prosecutor there has mixed, has blurred together two separate instances in the interrogation into one. But let me just say, right next to that, she says, The prosecutor says, You saw the images. You saw that they are matched up with the ages in the title of the file. And then the jury, which was subjected to this evidence, also had learned what PTHC means, and why isn't all this eliminated by harmless error? Well, why did the government need to comment on silence if their case was so strong otherwise? Well, why did they need to send 17 cops? But that's not the point. It seems unlikely to me that the jury, it seems extraordinarily unlikely that the jury would have rendered a verdict of not guilty if the file titles, and he's clearly associated with the files, have the ages of the kiddos on them. Well, but he explained, albeit not at the trial, that he explained in his interrogation, the file titles are not always indicative of what's contained in the file. But the point I was making was that the prosecutor was talking about two separate instances, and they're on pages 11 and 12 of the transcript of the interrogations in the record excerpts. The first comment was, I probably should talk to that lawyer first. Yeah. Then Officer Barnes switches gears. He goes on, asks more questions, and not till the bottom of the next page, page 12, does he ask again about the ages. And Officer Barnes says, well, only talk to me about stuff you want to talk about. And then Mr. Wright makes the comment in response to, you should be cooperative. I'll be, but I don't want to say anything again that's going to get me in trouble either. And that comment was not linked to the first invocation of silence. There was one invocation of silence, and then there's more questioning, and then there's another invocation of silence, and even then he doesn't say, I'm remaining silent because I don't want to get in trouble. The I don't want to get in trouble is a random comment. Two questions. One, would you feel there was an objection to the record that contained all this? Was there a Doyle objection that was continuing? Does it in any way mitigate a possible Doyle violation that the jury heard the entire exchange? I don't, because we're not complaining about hearing that he invoked his right to remain silent. We're complaining about the government's exploitation. Yes, and this came up in the Andaverde case also, and Rodriguez is the best case on that point. What's your best case in harmlessness? Rodriguez, again, Rodriguez was a case where this court found reversible Doyle error based on a single Doyle violation. There were others alleged in the case, but the court didn't reach them. The court said this one violation is enough under our jurisprudence going back to the Chapman test again to reverse. And so we would ask the court to reverse the convictions or in the alternative of the sentence. All right, thank you, Mr. Brooks. Thank you. Thank you, Ms. Wilson, for the briefing and argument in the case. It will be submitted.